UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SANTOS VALENTINE ROMERO MARROQUIN DE RODRIQUEZ, <br><br> Petitioner, <br><br> v. <br><br> PATRICIA HYDE, in her official capacity As Acting Field Office Director, Boston Field Office, U.S. Immigration and Customs Enforcement; MICHAEL KROL, New England Special Agent in Charge; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; and KRISTI NOEM, U.S. Secretary of Homeland Security, <br><br> Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: 25-CV-13210-AK |

## MEMORANDUM AND ORDER ON
## PETITION FOR A WRIT OF HABEAS CORPUS

**ANGEL KELLEY, D.J.**

Petitioner Santos Valentine Romero Marroquin de Rodriguez ("Petitioner" or "Romero") brings this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("Petition") challenging her immigration detention by U.S. Immigration and Customs Enforcement ("ICE") on October 30, 2025. [Dkt. 17]. Respondents oppose the Petition, claiming Romero was properly detained under 8 U.S.C. § 1231. [Dkt. 19]. For the following reasons, the Petition is **GRANTED**. Romero's Emergency Motion for Temporary Restraining Order [Dkt. 22] is **DENIED AS MOOT**.

1

I.      BACKGROUND

Romero, a Salvadoran national, has resided consistently in the United States since 2018. [Dkt. 17 ¶ 3]. Romero, a single mother fleeing domestic abuse, first entered the United States in 2005. [Id. at ¶ 10]. Upon arrival she was detained for six months before receiving a final deportation order on May 5, 2006 and was subsequently removed to El Salvador. [Id.]. In 2018, Romero again fled El Salvador fearing for her life after the kidnapping and disappearance of her youngest son. [Id. at ¶ 11]. Upon arrival, United States Border Patrol ("USBP") agents detained Romero and reinstated her 2006 removal order. [Id.]. On April 16, 2018, ICE released Romero from custody with an Order of Supervision ("OSUP"), which required continued compliance with conditions of release, including check-ins with ICE. [Id. at ¶ 12]. Romero has been in compliance with her OSUP since her release.

In 2020, Romero retained pro bono counsel and requested a reasonable fear interview ("RFI") "to present her claims for protection from persecution and torture in El Salvador." [Id. at ¶ 18]. Additionally, on July 24, 2025, Romero filed a Petition for Review with the First Circuit (Case No. 25-1710), which is currently held in abeyance, to preserve her ability to appeal a negative reasonable fear determination. [Id. at ¶ 19]. On December 2, 2024, Romero also filed a U-Visa application with USCIS based on assistance provided to law enforcement in investigating and prosecuting a domestic assault committed against her by her boyfriend at the time. [Id. at ¶ 20].

On October 30, 2025, Romero reported to the Framingham ISAP office to discuss her work permit. [Id. at ¶ 25]. After waiting for six hours, she was arrested and transported to the Burlington ICE office. [Id. at ¶ 26]. The Respondents claim that ICE ERO officers encountered Romero near Framingham and determined that she had a final order of removal and an arrest

warrant in El Salvador due to her membership in a criminal organization, Mara Salvatrucha ("MS-13"). [Dkt. 19 at 3]. To date, Romero "has not yet been presented with or had an opportunity to inspect this alleged warrant." [Dkt. 17 at 3, n.1].

Respondents allege ICE officers provided Romero with a Notice of Revocation of Release, which stated that her order of supervision was revoked due to an ICE determination that the purpose of release had been served and it was appropriate to enforce the removal order. [Dkt. 19 at 3]. While Respondents allege a change of circumstances warranting the revocation of Romero's release—namely a prior criminal history and warrant identifying Romero as an MS-13 member, which has existed since 2018—the Notice of Revocation of Release made no reference to such a change in circumstances. [Id. at Exh. A]. Instead, the notice simply tracks the language of the regulation. Further, Romero asserts neither she nor her counsel were given notice of the revocation of her OSUP. [Dkt. 17 ¶ 27]. Romero contends that she was given four pieces paper before being moved from Burlington to Maine, but ICE took them away. [Id. at ¶ 32]. The document provided by Respondents in their filing was presumably among the documents provided to Romero, but of note, was not translated to Spanish for Romero and was not provided to her counsel of record for review. Respondents also state that on November 4, 2025, ICE conducted an informal interview with Romero to give her an opportunity to respond, but Romero had not been notified of the alleged change of circumstances, meaning neither she nor counsel had the necessary notice of the allegations to appropriately prepare and respond during the interview. [Dkt. 19 at 3]. The Salvadoran warrant, which U.S. Courts and the government have consistently found to be unreliable [Dkt. 20 at 2-3], has still not been provided to Romero, her counsel, or the Court.

A reasonable fear interview was conducted on November 17, 2025, after which an asylum officer found that Romero had established a reasonable fear of torture in El Salvador. [Dkt. 17 at ¶ 18; Dkt. 22 at 3]. Romero was placed in withholding-only proceedings, with an initial hearing scheduled for December 11, 2025. [Dkt. 17 ¶ 18; Dkt. 19 at 1, 7]. Romero's next hearing date was scheduled for January 26, 2026 before the Immigration Court in Maine, where Romero was being held by the assent of both parties, but Romero was moved back to Massachusetts on or about January 23, 2026, without notice and in violation of this Court's Order regarding transfer between districts. [Dkt. 4].[1] Although Romero's January 26, 2026 hearing was cancelled because of inclement weather, Romero's transfer from Maine frustrated Romero's ability to meet with counsel in preparation and likely would have ultimately resulted in Romero missing the hearing. Romero's hearing has been rescheduled for February 3, 2026 [Dkt. 25 at 2], although it is unclear where and if in Maine, it is similarly unclear that ICE would transport Romero for the hearing.

## II. DISCUSSION

### A. Statutory Framework

Detention of non-citizens who have reentered the country after having received a final order of removal is governed primarily by 8 U.S.C. § 1231. Section 1231 provides "the Attorney General shall remove the alien from the United States within a period of 90 days" following an order of removal, a window known as the removal period. 8 U.S.C. § 1231(a)(1)(A). The removal period begins on the date the order of removal becomes administratively final. Id. § 1231(a)(1)(B)(i). Importantly, "DHS need not wait for the alien to seek, and a court to

---

[1] The Court notes that ICE signing its own permission slip, citing its own operational needs as reason for the transfer, offers little comfort or justification for ignoring a Federal Court Order. That "undersigned learned of the transfer after the fact" remains, similarly, concerning. [Dkt. 25].

complete, judicial review of the removal order before executing it.  Rather, once the BIA has reviewed the order (or the time for seeking the BIA's review has expired), DHS is free to remove the alien *unless* a court issues a stay." (emphasis in original).  Johnson v. Guzman Chavez, 594 U.S. 523, 534-35 (2021).

"During the removal period, the Attorney General *shall* detain the alien," meaning detention is mandatory. 8 U.S.C. § 1231(a)(2)(A) (emphasis added).  Of note, "[t]he removal period shall be extended beyond a period of 90 days," into a post-removal period, in certain circumstances. Id. §§ 1231(a)(1)(C), (c)(2)(A), (a)(6).  Important to the instant matter, once in the post-removal period, as is the case here, non-citizens are subject to a discretionary detention framework under Section 1231(a)(6), as opposed to Section 1231(a)(1)(A)'s mandatory framework.  The Supreme Court has made clear: "If no exception applies, an alien who is not removed within the 90-day removal period will be released subject to supervision."  Guzman Chavez, 594 U.S. at 529; see also 8 U. S. C. § 1231(a)(3); 8 CFR § 241.5.

> In cases where an individual who had previously been removed reenters the country,
>
> the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

8 U.S.C. § 1231(a)(5).  This subsection "'explicitly insulates the removal orders from review,' while also 'generally foreclos[ing] discretionary relief from the terms of the reinstated order.'" Guzman Chavez, 594 U.S. at 530 (quoting Fernandez-Vargas v. Gonzales, 548 U.S. 30, 35 (2006)).  Nonetheless, withholding of removal is available in certain circumstances where the person's life or freedom would be threatened because of their race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A).  There are carveouts to this restriction including if "there are serious reasons to believe that the alien

5

committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or there are reasonable grounds to believe that the alien is a danger to the security of the United States." Id. § 1231(b)(3)(B)(iii)-(iv).  The statute also requires that "if the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations." Id. § 1231(a)(3).  This section applies "even if withholding-only proceedings remain pending longer than 90 days." Guzman Chavez, 594 U.S. at 546-47.

### B.  DHS Regulations

The revocation of release of a non-citizen with a final order of removal who had previously received an Order of Supervision ("OSUP") under Section 1231 must adhere to DHS's own regulations under 8 C.F.R. § 241.4.  Section 241.4(l)(2) applies to non-citizens who were released for reasons other than foreseeability of removal.  In such cases, revocation of release is permitted when an immigration official determines that (1) "the purposes of release have been served," (2) "the alien violates any condition of release," (3) "it is appropriate to enforce a removal order or to commence removal proceedings against an alien," or (4) "the conduct of the alien, or any other circumstances, indicates the release would no longer be appropriate." Id. § 241.4(l)(2)(i-iv).  Proper revocation of release then requires that the non-citizen facing re-detention be notified of the reasons for revocation and be given an initial informal interview so as to "afford the alien an opportunity to respond to the reasons for revocation stated in the notification." Id. § 241.4(l)(1); see also Id. § 241.13(i)(3).

### C.  Substantive Due Process

In most circumstances, continued detention of a non-citizen with a final order of removal is reasonable regardless of pending withholding-only proceedings.  While it is well understood

that the indefinite detention of a non-citizen challenges the very liberty interests that the Due Process Clause seeks to protect, Zadvydas v. Davis, 533 U.S. 678, 690 (2001), the First Circuit has recognized that detention during the pendency of a withholding-only proceeding does not implicate such risks of indefinite detention. G.P. v. Garland, 103 F.4th 898 (1st Cir. 2024). Courts recognize that "withholding-only proceedings are finite" and because they "have a definite ending point, then so too must the detention pending the resolution of those proceedings." Id. at 903 (quoting Castaneda v. Perry, 95 F.4th 750, 757 (4th Cir. 2024)). Accordingly, Romero's continued detention while she awaits her withholding-only proceeding is lawful; however, that is not the end of this Court's analysis

### D. Procedural Due Process

While true that a pending withholding-only proceeding does not counsel Romero's release, the procedure by which release under OSUP is revoked must adhere to procedural due process mandates. Put simply, procedural due process requires adequate notice and an opportunity to be heard. Aponte-Rosario v. Acevedo-Vila, 617 F.3d 1, 9 (1st Cir. 2010). As such, ICE has imbedded this Constitutional mandate into its own procedural regulations: "Upon revocation [of OSUP], the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly . . . to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(l).

"ICE, like any agency, 'has the duty to follow its own regulations.'" Rombot v. Souza, 296 F. Supp. 3d 383, 388 (D. Mass. 2017) (quoting Haoud v. Ashcroft, 350 F.3d 201, 205 (1st Cir. 2003)). And where ICE has promulgated a set of regulations to protect a Constitutional right, such as the opportunity to be heard, a failure to adhere to such regulation makes the action

invalid. Id.  While the Supreme Court has granted ICE a great deal of discretion in detaining, releasing, and revoking release, it "has never given ICE a carte blanche to re-incarcerate someone without basic due process protection." Id. at 389; see also Zadvydas v. Davis, 533 U.S. at 700-01.

The case before this Court aligns with Perez-Escobar v. Moniz, where another Session of this Court considered whether ICE had violated its own regulations when it offered a merely conclusory explanation for revocation of release to a petitioner. 792 F. Supp. 3d 244 (D. Mass. 2025).  In its notice of revocation of release, DHS informed the petitioner only that (1) the purposes of his release had been served and (2) it was appropriate to enforce a removal order or to commence removal proceedings against him. Id. at 225.  The notice did not offer any additional change in circumstances that could support ICE's assertion. Id. at 226.  The court therefore concluded that "ICE's conclusory explanation for revoking Petitioner's release did not offer him adequate notice of the basis for the revocation decision such that he could meaningfully respond at the post-detention 'informal interview.'" Id. at 226.  Accordingly, petitioner was ordered released subject to his prior conditions of release.  Id. at 226-27.

Here, Petitioner Romero similarly faces a revocation of release related to her reinstated order of removal.  Yet, just like the petitioner in Perez-Escobar, the only explanation offered in the provided Notice of Revocation appears to be that "the purpose of release has been served and it is appropriate to enforce the removal order." [Dkt. 14 at 3].  Such "conclusory explanations" are insufficient to afford Petitioner her procedural due process rights. Perez-Escobar 792 F. Supp. 3d at 226.  While Respondents assert that Petitioner's alleged involvement in MS-13 and outstanding warrant in El Salvador resulted in changed circumstances that justify her re-detention, Petitioner was never notified as to the accusations against her.  Notice under the Due

8

Process Clause exists to "permit adequate preparation" for the opportunity to be heard. Mard v. Town of Amherst, 350 F.3d 184, 189 (1st Cir. 2003) (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 14 (1978)).  Where ICE's notice did not provide Petitioner with sufficient information to adequately prepare her response to the allegations against her, due process has not been served and any post-hoc rationalizations, as provided by the Respondent, are insufficient to remedy the violation.  See Guzman Valdez v. McDonald, No. 25-cv-12308-MJJ (D. Mass. 2025) (Joun, J.) (ordering release where the respondents failed to show that they had given the petitioner adequate notice and a meaningful opportunity to be heard when his OSUP was revoked); Hall v. Messinger, No. 25-cv-667-JJM-PAS at 17 (D.R.I. 2025) (holding that "ICE's failure to provide a non-citizen with adequate notice of its basis for revoking supervised release violates the non-citizen's due process rights"); M.S.L. v. Bostock, No. 25-cv-01204-AA, 2025 WL 2430267, *10-12, *14 (D. Or. 2025) (slip copy) (ordering release where Respondents failed to timely provide Petitioner with a valid Notice of Revocation and failed to promptly conduct an informal interview); Khamba v. Albarran, No. 25-CV-01227-JLT-SKO, 2025 WL 2959276, at *10 (E.D. Cal. 2025) (declining to credit a post-hoc explanation for petitioner's re-detention).

In cases where due process has been violated by ICE's failure to adhere to its own regulations, courts are entitled to release petitioner subject to the conditions of their prior release. See Perez-Escobar, 792 F. Supp. 3d at 226-27; Rombot v. Souza, 296 F. Supp. 3d at 389; Nguyen v. Hyde, 788 F. Supp. 3d 144, 152 (D. Mass. 2025).[2]  For the reasons discussed above, because Respondents have failed to adhere to their own regulations, and in the process, violated

---

[2] The Court also joins district courts in other circuits who have released petitioners on the same procedural due process grounds.  See Zhu v. Genalo, 798 F. Supp. 3d 400 (S.D.N.Y. 2025); Ceesay v. Kurzdorfer, 781 F. Supp. 3d 137 (W.D.N.Y. 2025); Santamaria Orellana v. Baker, No. CV 25-1788-TDC, 2025 WL 2444087 (D. Md. Aug. 25, 2025).

9

Petitioner's procedural due process rights, the Court orders Petitioner released pursuant to the conditions in her preexisting Order of Supervision.

### III. CONCLUSION

For the foregoing reasons, Romero's Petition is **GRANTED**. Respondents are **ORDERED** to release Petitioner on the previously set conditions of release. Romero's Emergency Motion for Temporary Restraining Order [Dkt. 22] is **DENIED AS MOOT**.

**SO ORDERED.**

Dated: January 28, 2026                                          /s/ Angel Kelley
                                                                 Hon. Angel Kelley
                                                                 United States District Judge